**WESTCO PRODUCTS, INC., Plaintiff,**

v.

**SHEARSON/AMERICAN EXPRESS, INC., Defendant.**

**No. CV 85–0221–WJR(Kx).**

United States District Court, C.D. California.

Dec. 1, 1986.

Robert S. Ackerman, Los Angeles, Cal., for plaintiff.

Stephen Young, Keesal, Young & Logan, Long Beach, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

REA, District Judge.

The above-entitled matter came on for trial on November 12, 1986, before the Honorable William J. Rea, United States District Judge, presiding, sitting without a jury, a jury having been waived by both parties.

Plaintiff Westco Products, Inc. ("Westco") appeared by its attorney Robert S. Ackerman, a member of Robert S. Ackerman Law Corporation. Defendant Shearson/American Express, Inc. ("Shearson") appeared by its attorney, Stephen Young, of Keesal, Young & Logan.

The Court, having considered the evidence, having heard oral argument, and the matter having been submitted for decision on November 19, 1986, finds and concludes as follows:

## FINDINGS OF FACT

1. Westco is a corporation duly organized and existing under and by virtue of the laws of the State of California.

2. Westco has its principal place of business in Los Angeles County, California.

3. Shearson is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware.

4. Shearson has its principal place of business in New York.

5. Westco is, and has been for many years, in the business of manufacturing and distributing baking ingredients and related products to, among others, bakeries, doughnut shops, institutions, hotels, hospitals, restaurants, and the like. Westco conducts its business in most of the Western States.

6. As of 1983, Allen Ziegler ("Ziegler") held 50 percent of the stock of Westco, was its Executive Vice President, and General Manager. Other members of the Ziegler family owned the balance of the stock in Westco.

7. Westco's net profits, before taxes in 1983, were approximately $3.5 million on gross revenues of approximately $45 million.

8. Westco's net profits, before taxes, in 1984, were approximately $4.5 million on gross revenues of approximately $55 million.

9. Prior to 1982, Westco did not invest any of its revenues in the stock market.

10. Shearson is, and at all times pertinent hereto was, a securities broker/dealer registered under the Securities Exchange Act of 1934.

11. Rachford Harris ("Harris") is, and at all times pertinent hereto was, a securities broker/dealer, a sales representative of Shearson in Los Angeles, and a member of both the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"). Harris was a long-time acquaintance of Ziegler. As a matter of fact, Harris and Ziegler were classmates at Los Angeles High School approximately 60 years ago. Ziegler in 1957 invested $20,000.00 in an insurance company at the suggestion of Harris and today that investment is worth over $20 million. Both Harris and Ziegler have college degrees, and Ziegler has a law degree, but has never practiced law.

12. Lane Goldstein ("Goldstein") is, and at all times pertinent hereto was, a securities broker/dealer, a Vice President of Shearson in Los Angeles, and a member of the NYSE and NASD.

13. Stephen Wilshinsky ("Wilshinsky") is, and at all times pertinent hereto was, a securities broker/dealer, a Vice-President of Shearson in Los Angeles, and a member of the NYSE and NASD.

14. A stock dividend "rollover" program is typically defined in the securities industry as a trading technique in which a broker sells a block of stock that has just

gone "ex-dividend" and replaces it with another issue that will go ex-dividend in as short a time as possible in order to maximize dividend income.

15. In or about January, 1983, Westco engaged Oppenheimer and Co., Inc. ("Oppenheimer"), a registered broker/dealer, to invest certain funds of Westco in Oppenheimer's preferred utility stock dividend roll-over program ("Oppenheimer Program"). The Oppenheimer Program was a sophisticated and complex trading program in which Oppenheimer purchased and sold preferred utility stocks on behalf of Westco, both "long" and "short," in order to (1) generate substantial tax benefits to Westco while at the same time (2) minimizing or eliminating the primary risk to the capital investment caused by fluctuation in interest rates.

16. Tax benefits to Westco from the Oppenheimer Program were generated due to the fact that not only was 85 percent of the dividend income received by Westco from the stocks purchased "long" excluded from Westco's income for the purpose of income taxes, but 100 percent of the dividend income payable from the stocks sold "short" was fully deductible as ordinary expense. Under the current Internal Revenue Service rules, the stock must be held for a period of 16 days to be eligible for such favorable tax treatment.

17. Under the Oppenheimer Program the minimization of risk was accomplished through the process of "hedging," that is, selling "short" essentially the same value of preferred utility stocks which were being purchased "long." Since preferred utility stocks typically increase or decrease in value inversely to the increase or decrease in interest rates, Oppenheimer by means of "hedging" thus reduced the primary risk to Westco's capital investment.

18. The purpose of the Oppenheimer Program was to secure tax benefits and was not designed for the purpose of generating income through the buying and selling of securities for profit.

19. The Shearson version of the preferred utility stock dividend roll-over program differed substantially from that of Oppenheimer. Shearson did not "hedge." The purpose of Shearson's program was (1) to generate dividends that were 85 percent excluded from the income of the investing corporation and (2) to obtain profit through the purchase and sale (always on a "long" basis) of securities which had appreciated in value (the "Shearson Program"). Under the Shearson Program the investor could make a profit trading in preferred utility stocks, but the investor could also lose a substantial portion of its investment if interest rates increased, thus decreasing the value of such securities. The Oppenheimer "hedged" program was not subject to such market risks.

20. In April, 1983, Ziegler, recalling that Harris was still active as a stock broker, contacted him and asked whether or not Shearson had a "roll-over" utility program in cooperation with a 16-day rule. Harris responded that he did not know if his company had such a program, but he would inquire and advise Ziegler of the outcome of his inquiry. Harris, thereafter, checked with Shearson's New York office and was advised that Shearson did, in fact, have a preferred dividend roll-over program. This fact was communicated to Ziegler by Harris. Ziegler advised Harris that he had a dividend roll-over program with Oppenheimer. Nothing was said in this conversation about the pros and cons of the Oppenheimer Program vis-a-vis the Shearson Program. Ziegler did not inquire about the Shearson Program as to whether or not it hedged or whether it bought "long" and sold "short" nor did he discuss with Harris any of the characteristics of the Oppenheimer Program. Harris did not inquire of Ziegler as to what Westco's objectives were in making such investments nor did he inquire into the amount of money which Westco intended to invest in the roll-over program with Shearson. At the time of this conversation, Harris did not know the difference between the Shearson Program and the Oppenheimer Program. Harris made no attempt to ascertain what,

if any, differences there might be between the two programs.

21. Upon being advised that Shearson did, in fact, have a preferred dividend roll-over program, Ziegler, on behalf of Westco Products, opened an account with Shearson on April 22, 1983.

22. Ziegler, on behalf of Westco Products, deposited $300,000.00 with Shearson on April 22, 1983. On April 27, 1983, after obtaining the advice of Paul Pleister, of Shearson's preferred desk in New York, Harris bought for Westco, after obtaining its permission to do so, 5,200 shares of Southern California Edison 8.96 percent preferred stock, and on April 29, 1983, bought 5,200 shares of Alabama Power Company 4.92 percent preferred stock.

23. Ziegler, on behalf of Westco, on April 26, 1983, sent another check for $350,000.00 and followed that with yet another check for $200,000.00 on May 5, 1983.

24. Harris was instructed by Ziegler to contact Richard Sakai with respect to the every-day transactions and to send Mr. Sakai the confirmation slips of sales and purchases as well as the monthly statements. Throughout the entire period of time that Shearson was investing in the preferred roll-over program on behalf of Westco, prior permission was obtained from Westco through Sakai before the purchase or sale was made. Sakai was the Comptroller-Accountant for Westco at all times pertinent to the events in question herein.

25. After Harris made the first two initial purchases for Westco and after having received $850,000.00 in checks from Westco, Harris determined that he should have some help in servicing Westco's account. Harris was advised by his Branch Manager that Goldstein and Wilshinsky, Vice Presidents of Shearson, were experienced and possessed of considerable expertise in the preferred stock dividend roll-over program. In mid-May, Harris met with Goldstein and Wilshinsky and it was decided that if Westco approved, Goldstein and Wilshinsky would make recommendations for further transactions utilizing the preferred dividend roll-over technique. Harris, Goldstein, and Wilshinsky entered into a commission-sharing arrangement. Harris advised them of the current positions in the account of Southern California Edison and Alabama Power. They were also informed by Harris that Westco was maintaining a preferred dividend roll-over account at Oppenheimer and at that time the account contained in excess of $1 million.

26. On May 24, 1983, Ziegler participated in a conference telephone call with Goldstein and Wilshinsky regarding Shearson's preferred dividend roll-over program.

27. During the conference call of May 24, 1983, Goldstein and Wilshinsky explained in detail Shearson's preferred dividend roll-over program to Ziegler. The program was fully explained to Ziegler. Ziegler asked no questions of either Goldstein or Wilshinsky. He did advise them, however, that he was a very busy man running a large company and that they should conduct their business with Sakai at Westco. Nothing was said in this conversation about the differences between the Shearson Program and the Oppenheimer Program. The subject matter was never raised by Ziegler nor by Goldstein or Wilshinsky. Ziegler did not object to Goldstein and Wilshinsky handling the account nor did he object to the proposed manner in which they were going to invest Westco's money. In fact, Ziegler gave permission to the brokers to proceed with the program as it was explained to him.

28. On May 27, 1983, 3,000 shares of Pacific Gas & Electric preferred stock were purchased. In June, 1983, 10,000 shares of Ohio Edison preferred, 3,500 shares of Louisiana Power & Light preferred, 1,000 shares of Pacific Gas & Electric 12.80 percent preferred, 5,057 shares of Pacific Gas & Electric 10.18 percent preferred, and 9,100 shares of Union Electric were purchased.

29. On May 18, 1983, Ziegler, on behalf of Westco, deposited another $250,000.00 with Shearson, and on June 1, 1983, another $300,000.00.

30. In July, 1983, 2,000 shares of Georgia Power preferred were purchased and 10,000 shares of Detroit Edison preferred were purchased and Ziegler, on behalf of Westco, deposited another $250,000.00. No additional deposits were made after the sum of $1,650,000.00 was deposited between April 22 and July 19, 1983.

31. Each time there was a recommended transaction, the Shearson brokers contacted Sakai pursuant to Ziegler's instructions and Sakai approved.

32. In September, 1983, additional shares of Union Electric preferred were purchased along with shares of El Paso Natural Gas preferred and Kansas City Power & Light preferred.

33. In October, 1983, the last purchase in the account was made, which consisted of the purchase of an additional 1,700 shares of Ohio Power preferred. No purchases were made in the account thereafter.

34. After each and every transaction in the account, Westco was provided with a confirmation slip and at the end of each month they were provided a monthly statement. The Shearson monthly statements, in addition to containing information regarding various buys, sells, dividends, deposits, etc., also contained a plainly marked box entitled "Equity," which informs a customer of the exact net worth of the account at the end of each month. Shearson's monthly statements also show the open positions in the account at the end of each month and marked them to the market showing the customer the current price of each security so that the customer can follow not only the profits and losses on closed transactions, but also the paper profits or losses on open transactions.

35. Despite the fact that Shearson recommended only the highest quality securities and despite the fact that the account produced $232,624.84 of dividends and interest to Westco, the account from the beginning dropped in value because the price of the underlying securities declined. This decline was caused by a rise in interest rates and a scare that there were enormous cost overruns and regulatory and environmental problems associated with certain utilities that had nuclear plants under construction. This nuclear power plant panic lapped over and affected utility stocks that had nothing to do with anything nuclear. Under Shearson's program, those preferred stocks which declined should have been held and not rolled over. If the stocks were rolled over, the account would suffer losses. Shearson recommended to Westco that it hold its position until the stocks recovered their value.

36. Not only was Westco able to monitor the account by examining confirmation slips and monthly statements, but it also had the benefit of Westco's accounting firm analyzing, on a monthly basis, Westco's business gains and losses as well as Westco's investments. The Westco accounting firm provided Westco with a summary of exactly where Westco's Drexel Burnham Lambert, Oppenheimer & Co., and Shearson/American Express accounts stood.

37. In early December, 1983, Ziegler summoned the Shearson brokers and Westco's accounting firm to a meeting. Ziegler requested an explanation of why the Shearson account was doing so poorly. Westco, between April and July, 1983, deposited $1,650,000.00, and as of December 1, 1983, the account was down to $1,566,336.00, a loss of $83,664.00. The brokers explained to Ziegler that the account was down because the underlying preferred securities had lost value due to a rise in interest rates and because of fear over nuclear power plants.

38. During the meeting of December, 1983, Ziegler stated for the first time that he thought Shearson's preferred roll-over program was "hedged" and utilized a like amount of "short" transactions as well as "long" transactions. The brokers reminded Ziegler that Shearson did not go "short," but only "long." Also, confirmation slips sent to Westco the previous seven months reflected only "long" transactions as did the monthly statements.

39. Wilshinsky directed a letter to Ziegler on December 13, 1983, once again explaining Shearson's program and urged Ziegler to continue to maintain existing positions in the Shearson Program because in his opinion the stocks would ultimately increase in value, and in the meantime Westco would continue to receive substantial dividends which were 85 percent tax free.

40. Westco maintained its existing positions at Shearson for several months, but in April of 1984 it retained an investment advisor, Churchill Management, which advised Shearson to immediately sell out all of the positions "at the market." This was done contrary to Shearson's advice which was to hold the positions and was contrary to Shearson's advice that the positions should not be sold "at the market." The order to liquidate the accounts "at the market" caused Westco to suffer an approximate $50,000.00 loss.

41. Had Westco followed the advice of Shearson and held its positions, the account would not have lost money and in fact would now be up more than $700,000.00 in appreciated value. Shortly after Westco sold its stock in the Shearson account, the preferred stocks recovered completely.

■ 42. Any confusion over Westco's investment goals and desires which followed the telephone conference call of May 23, 1983, when Ziegler was fully informed as to the Shearson Program, was the failure on Westco's part to properly communicate with the Shearson brokers and its failure to monitor the transactions in the Westco account at Shearson.

43. Plaintiff failed to properly review confirmation slips and monthly reports sent to it by Shearson which clearly demonstrated only purchases of preferred stock, not "hedging" or the simultaneous buying and selling of equal amounts of preferred stock.

44. Westco is responsible for all its losses in the Shearson account following the May 24, 1983, telephone conference. Westco, through Ziegler, made a decision to continue on with the Shearson Program after having it fully explained. Therefore, any and all damages suffered by Westco following that date are not the responsibility of Shearson.

■ 45. The Court finds that the plaintiff suffered damages in its Shearson account up to and including May 24, 1983, in the sum of $21,000.00. The Court finds that Harris breached his duty as a fiduciary in failing to inform Ziegler of the basic concepts of the Shearson Program and neglected to discover the objectives and aims of Westco in its investments. As a proximate result of Harris' failure to properly advise Westco, through Ziegler, Westco has suffered damages in the sum of $21,-000.00 in its Shearson account.

46. By reason of Ziegler's silence and failure to inquire further during the May 24, 1983, telephone conversation, and by reason of his actions as well as Westco's following that date, Shearson could only assume impliedly that goals embodied within the Shearson Program were acceptable to Ziegler and Westco. Therefore, the Court finds that a proper cut-off date for the purpose of assessing damages is May 24, 1983.

## CONCLUSIONS OF LAW

1. Shearson is not liable to Westco for violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

2. Shearson is not liable to Westco for intentional or negligent misrepresentation.

3. Shearson is not liable to Westco for breach of contract.

4. Shearson breached its fiduciary duties owed to Westco and, as a proximate result of such breach, Westco has been damaged in the sum of $21,000.00.

5. Westco failed to use the requisite due diligence to monitor its account after May 24, 1983.

6. Westco, after May 24, 1983, ratified the trading in the Shearson account by failing to timely object to any transactions.

7. Westco, after May 24, 1983, waived its right to challenge trades in the Shearson account by failing to timely object.

8. There is no basis for the award of punitive damages and the facts do not support any such award.

### JUDGMENT

This action came on for trial before the Court sitting without a jury, the Honorable William J. Rea, United States District Judge, presiding, the issues having been duly tried and a decision having been duly rendered,

It is ORDERED, ADJUDGED, and DE-CREED that plaintiff Westco Products, Inc. recover of the defendant Shearson/American Express, Inc. the sum of $21,000.00, with interest thereon at the rate of 5.77 percent as provided by law, and its costs of action.